**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                               )
UNITED STATES OF AMERICA       )
                               )
v.                             )        Criminal Action
                               )        No. 24-cr-10201-PBS
ELGUN MIKAIYLOV,               )
                               )
               Defendant.      )
_____)
```

**MEMORANDUM AND ORDER**

April 16, 2026

Saris, J.

**INTRODUCTION**

On May 8, 2024, Defendant Elgun Mikaiylov was interviewed in the Bristol County District Attorney's office by two law enforcement officers as part of an investigation into the armed robbery of a cash courier. He had voluntarily gone to the District Attorney's office to answer questions and was not under arrest. The officers did not recite warnings under Miranda v. Arizona, 384 U.S. 436 (1966). Eventually, the officers requested that Mikaiylov consent to a search of the contents of his cell phone. At that point, Mikaiylov expressed interest in speaking to an attorney. The officers responded that he could do so but that they would nevertheless keep his phone while applying for a search warrant. Mikaiylov then agreed to sign the consent form, and the officers copied the contents of his phone.

1

Mikaiylov now moves to suppress his statements from the interview and the copied contents of his cell phone. He argues that the officers were required to deliver Miranda warnings, that the interview and attempt to search his phone should have stopped when he requested an attorney, and that his consent to the search was not provided voluntarily.

After an evidentiary hearing, the Court concludes that Mikaiylov was not in custody during the interrogation and thus that the officers were neither required to provide Miranda warnings nor obligated to stop the interview when Mikaiylov expressed a desire to speak to an attorney. The Court further determines that Mikaiylov willingly and voluntarily signed the consent form. Accordingly, Mikaiylov's motion to suppress (Dkt. 177) is **DENIED**.

## BACKGROUND

The following findings of fact are based on the evidentiary hearing, supplemented, where necessary, with uncontested facts from the parties' briefing. See United States v. Miles, 18 F.4th 76, 77 (1st Cir. 2021). The Court presumes familiarity with its prior description of the robbery at issue. See United States v. McDonald, __ F. Supp. 3d __, __ (D. Mass. 2026) [2026 WL 84181, at *1-2] (denying motion to suppress filed by one of Mikaiylov's codefendants).

On February 19, 2024, two individuals robbed a courier carrying over $400,000 in cash collected from local cannabis

dispensaries. See id. One of those dispensaries was Cosmopolitan Dispensary, where Mikaiylov worked as a manager.

The day after the robbery, Special Agent Patrick Briody of the Bureau of Alcohol, Tobacco, Firearms and Explosives visited Cosmopolitan Dispensary and spoke with Mikaiylov for over an hour. Mikaiylov did not provide the names of any suspects. Unbeknownst to Agent Briody, Mikaiylov had in fact contacted Steven Madison -- who has since pleaded guilty to several counts for his involvement in the offense -- earlier that day about whether Madison had committed the robbery. In March 2024, Agent Briody discovered that Mikaiylov was a contact in Madison's call records.

After several months of further investigation, in the morning of May 8, 2024, officers executed search warrants at the residences of Madison, Christopher White, and Quentin McDonald, each of whom was criminally charged that day for his involvement in the robbery. That same day, Agent Briody reached out to Mikaiylov by phone and asked if he and another manager at Cosmopolitan Dispensary would conduct a more formal interview with law enforcement. Mikaiylov agreed, and, early that afternoon, he and his co-manager arrived for the interview at the Bristol County District Attorney's office.

Agent Briody met Mikaiylov and his co-manager in the building lobby. Agent Briody was wearing khaki pants and a sweatshirt. He had a firearm and badge on his waist, but they were covered by his sweatshirt. He guided Mikaiylov and his co-manager up a stairwell

to the District Attorney's office, showing them the location of the restrooms. In the District Attorney's office, the group met with Detective Jonathan Furtado of the Swansea Police Department. Detective Furtado was dressed similarly to Agent Briody but with an outside-the-waistband firearm.

Mikaiylov's co-manager was asked to wait in the lobby of the District Attorney's office while Agent Briody and Detective Furtado interviewed Mikaiylov first. Agent Briody, Detective Furtado, and Mikaiylov entered an interview room using a passkey. The door to the lobby was not locked from the inside of the interview room. The interview room was recorded and videotaped.

Agent Briody and Detective Furtado asked Mikaiylov to confirm that he had no weapons, but they did not frisk him. The officers did not recite Miranda warnings. Mikaiylov's demeanor was casual and friendly, and he did not request or attempt to leave.

The interview began at around 1:20pm. Agent Briody asked Mikaiylov if he knew Madison, and Mikaiylov confirmed that he did. Mikaiylov stated that Madison used to come to the dispensary and that Mikaiylov would sometimes pick up "party favors" from Madison. Agent Briody and Detective Furtado understood, and later clarified, that the term "party favors" referred to cocaine.

Agent Briody asked Mikaiylov if he had spoken to Madison about the robbery. Mikaiylov responded that he had called Madison on February 20, 2024, just prior to Agent Briody's arrival at

4

Cosmopolitan Dispensary, to ask if Madison had been involved. Mikaiylov had not previously informed Agent Briody about those communications.

As the officers continued asking about Madison, Mikaiylov's demeanor changed. Mikaiylov became increasingly tense, hunched over, fidgety, and nervous, frequently rubbing his face and body. Agent Briody and Detective Furtado pushed back on some of Mikaiylov's answers, but they never yelled. At one point, Agent Briody told Mikaiylov that it was a criminal offense to be untruthful to a federal agent.

Agent Briody then asked if Mikaiylov would consent to a search of his phone. Mikaiylov at first agreed, saying, "whatever it takes for you guys to understand that I had nothing to do with this." Ex. 3 at 4. Agent Briody and Detective Furtado then stepped into the hallway to retrieve a consent form. As they left the interview room, they told Mikaiylov to leave his phone in the middle of the table, where it already was, so that he could not change anything on the phone. In the hallway, Detective Furtado saw on the video recording that Mikaiylov reached for his phone and touched it, seemingly in response to receiving a call or text. Detective Furtado immediately reentered the interview room and told Mikaiylov to place the phone back in the middle of the table.

The officers returned to the interview room with a written consent form. Agent Briody reviewed the portion of the form that

stated that Mikaiylov had a right to refuse consent to the search of his phone but would knowingly waive that right. Mikaiylov then asked, "do I need to -- I mean, am I a suspect here? Do I need to get a lawyer?" Id. at 7. Agent Briody responded, "that's always your right, obviously. Um, right now . . . you're a witness to it. . . . [I]f you don't feel comfortable doing it, then that's okay, too." Id. Agent Briody asked if Mikaiylov wanted to sign the consent form to "get [his] phone back fairly quickly." Id. at 8. Mikaiylov replied, "let me just . . . think about it. . . . I just want to show it to a lawyer to see what I can do." Id.

Agent Briody said he understood but that the officers would "still have to take [Mikaiylov's] phone . . . as probable cause" and apply for a search warrant. Id. He then continued asking Mikaiylov questions about the robbery. Agent Briody stated that he would get a property receipt for the phone and reiterated that the officers "ha[d] to take the phone." Id. at 11. Mikaiylov asked, "[C]an I think about this? I need to talk to my lawyer." Id. Agent Briody responded, "[Y]eah, if you want to call me back after we leave here. . . . I still obviously have to keep [the phone] for now." Id. at 11-12. He added that if Mikaiylov decided to sign the consent form, "that would save the . . . time turn around basically." Id. at 12.

After answering some more questions about the robbery, Mikaiylov asked if he would get his phone back after the search.

6

Agent Briody confirmed that he would. Mikaiylov then said that he was willing to sign the consent form and that he had been under the mistaken "impression that [the officers] were just going to keep [his] phone." Id. at 17. Mikaiylov filled out and signed the form. In addition to confirming Mikaiylov's consent to the search of the phone, the consent form stated that Mikaiylov had the right to "request that the[] [officers] stop searching at any time during the search, and that [his] request w[ould] be honored." Ex. 4. After Mikaiylov signed the consent form, Agent Briody began electronically copying the contents of Mikaiylov's phone, during which time the interview continued for about another hour.

The interview concluded after 3:00pm. Mikaiylov was never told that he could not leave, was never touched or handcuffed, and was provided water. Mikaiylov left the office after the interview, and his phone was returned to him the following morning. He never reached out to Agent Briody to retract his consent to the search.

## DISCUSSION

Mikaiylov raises two arguments. First, he contends that Agent Briody and Detective Furtado were required to, but did not, provide Miranda warnings and that they failed to cease questioning him when he purportedly invoked his right to counsel. Second, he asserts that the environment of his questioning was unduly coercive and thus that his signing the consent form did not constitute valid

7

consent to the search of his phone. The Court addresses each argument in turn, rejecting both.[1]

## I.    <u>Right to Counsel</u>

<u>Miranda</u> warnings are required only before "custodial interrogation." <u>Vega v. Tekoh</u>, 597 U.S. 134, 141 (2022). The parties agree that no <u>Miranda</u> warnings were given to Mikaiylov, and the government does not dispute that Mikaiylov was interrogated. Rather, the sole contested issue is whether Mikaiylov was in custody during his questioning.

An individual is in custody if, "in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" <u>United States v. O'Neal</u>, 17 F.4th 236, 240-41 (1st Cir. 2021) (alteration in original) (quoting <u>United States v. Melo</u>, 954 F.3d 334, 339 (1st Cir. 2020)). Factors that inform whether a suspect was in custody "include 'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'"

---

[1] Because the Court determines that neither a violation of the <u>Miranda</u> rule nor a constitutional violation occurred, it need not resolve the government's argument that the inevitable discovery exception to the exclusionary rule would preclude suppression.

United States v. Howard, 66 F.4th 33, 47 (1st Cir. 2023) (quoting United States v. Fornia-Castillo, 408 F.3d 52, 63 (1st Cir. 2005)).

Here, Mikaiylov was not in custody. First, although Mikaiylov was interviewed in the District Attorney's office rather than a familiar or neutral setting, "he went there voluntarily and there was no . . . restriction on his freedom" to leave. United States v. Quinn, 815 F.2d 153, 160 (1st Cir. 1987); see United States v. Swan, 842 F.3d 28, 32 (1st Cir. 2016) ("[T]he mere fact that the questioning took place at the station does not render it custodial.").

Second, "only two [officers] participated in the questioning." United States v. Hughes, 640 F.3d 428, 436 (1st Cir. 2011). Those officers were in plainclothes, and only one of them had a weapon visible. See id. (finding an interrogation noncustodial where two officers "carried visible weapons[] and those weapons remained in their holsters").

Third, although Mikaiylov was not permitted to use his phone during the interview or take it with him afterwards, he "was not handcuffed or otherwise physically restrained" in any way. Swan, 842 F.3d at 33; see id. (finding an interview noncustodial even though officers "were in possession of [the defendant's] cellphone throughout much of the interview"). Indeed, Mikaiylov was told that he could leave without his phone. Cf. United States v. Lanni, 951 F.2d 440, 442-43 (1st Cir. 1991) (finding an interrogation

noncustodial where the defendant was neither told that she could leave nor that she could not leave).

Finally, the interview lasted only approximately two hours, and although the officers pushed back on some of Mikaiylov's answers, there was no yelling. See Swan, 842 F.3d at 33 (noting that encounters of "approximately ninety minutes . . . are not necessarily custodial" and that a conversation was noncustodial where it "was characterized by 'a generally even-tone back and forth'"). Mikaiylov was shown the location of the restroom and given water.

The Court thus concludes that Mikaiylov was not "taken into custody or otherwise deprived of his freedom of action in any significant way" during the interrogation. United States v. Orlandella, 96 F.4th 71, 102 (1st Cir. 2024) (quoting United States v. Simpkins, 978 F.3d 1, 9 (1st Cir. 2020)). Miranda warnings therefore were not required.

Mikaiylov nevertheless argues that because he requested an attorney, the officers were required to cease questioning him and were not entitled to request his consent to search his phone. But although an interrogating officer must cease questioning when a suspect in custody has invoked his right to counsel, see Edwards v. Arizona, 451 U.S. 477, 484-85 (1981), Mikaiylov cites no cases supporting his argument that the same requirement exists where an interrogation is noncustodial. On the contrary, courts have held

10

that because no Fifth Amendment right to counsel exists when an individual is not in custody, questioning may continue even when such an individual requests an attorney. See, e.g., United States v. Kelly, 329 F.3d 624, 629-30 (8th Cir. 2003); Tukes v. Dugger, 911 F.2d 508, 514-16 (11th Cir. 1990). Given that Mikaiylov had no right to an attorney under either the Fifth or Sixth Amendments at the time of his questioning,[2] the officers were entitled to continue questioning him and seek his consent to a search even after he expressed interest in consulting counsel. Mikaiylov's request to speak to an attorney thus does not require suppression of any of his statements or the evidence obtained from his cell phone.

## II.   **Voluntariness of Consent**

Mikaiylov next argues that he did not voluntarily sign the consent form because his will was overborne by the tactics of Agent Briody and Detective Furtado. The Court rejects this argument.

The government does not dispute that even before Mikaiylov signed the consent form, his phone had been seized: Mikaiylov was told to leave the phone on the table, and Agent Briody explicitly told him that if he did not consent to the search, the phone would still be held as the officers applied for a warrant. The government

---

[2] Mikaiylov had no Sixth Amendment right to counsel because "criminal judicial proceedings" against him had not yet begun. United States v. Ocean, 904 F.3d 25, 33 (1st Cir. 2018).

argues that the basis for the seizure at that moment was that the officers had probable cause to believe that evidence of a crime was on the phone and were entitled to temporarily freeze the phone while applying for a warrant. See, e.g., United States v. Henry, 827 F.3d 16, 28 (1st Cir. 2016) (noting that Supreme Court precedent allows officers to "seize . . . phones to prevent destruction of evidence but obtain a warrant before searching the phones"); United States v. Smith, 967 F.3d 198, 208-09 (2d Cir. 2020) (holding that "the existence of probable cause" that a tablet contained evidence of a crime "entitled the police to immediately seize the tablet so that they could apply for a warrant to search its contents"). As the government points out, Agent Briody and Detective Furtado knew at the time of the seizure that Mikaiylov had been in communication with Madison the day after the robbery but had not previously been forthcoming about that fact with Agent Briody; that Madison's phone had Mikaiylov as a contact; and that Mikaiylov became noticeably nervous when discussing Madison.

For his part, Mikaiylov does not dispute the government's basis for the seizure. Rather, Mikaiylov challenges only the subsequent search of the phone pursuant to the signed consent form, asserting that he did not sign the form voluntarily.

A "warrantless search [is] constitutionally permissible" if a defendant provides "[v]alid consent." United States v. Mumme, 985 F.3d 25, 36 (1st Cir. 2021) (quoting United States v.

Perez-Montañez, 202 F.3d 434, 438 (1st Cir. 2000)). To prove that a defendant's consent was valid, "[t]he burden is on the government 'to establish, by a preponderance of the evidence, that consent was "freely and voluntarily given."'" Id. (quoting Perez-Montañez, 202 F.3d at 438). "[M]ere acquiescence in the face of an unfounded claim of present lawful authority" is insufficient. Id. (quoting Perez-Montañez, 202 F.3d at 438).

The "voluntariness of consent to a search must be 'determined from the totality of all the circumstances.'" Birchfield v. North Dakota, 579 U.S. 438, 478 (2016) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). To determine whether the government has demonstrated voluntariness, courts consider factors such as "the defendant's age, demeanor, intelligence, education, experience, 'knowledge of the right to refuse consent,' and 'possibly vulnerable subjective state,' as well as 'evidence of inherently coercive tactics, either in the nature of police questioning or in the environment in which the questioning took place.'" Mumme, 985 F.3d at 36 (quoting United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989)).

The government has met its burden of showing that Mikaiylov's consent to the search of his phone was voluntary. Mikaiylov was verbally informed of his right to refuse consent. The consent form also stated that he could retract his consent after leaving the interview, but he never did so. And Agent Briody's "statement to

13

[Mikaiylov] that he would seek a search warrant did not vitiate [Mikaiylov]'s consent." Id. Mikaiylov's decision to sign the consent form so that he would not lose access to his phone while the police obtained a warrant does not render the consent involuntary. I find that Mikaiylov voluntarily signed the consent form.

To the extent that Mikaiylov also contends that his statements during the interrogation were not provided voluntarily, this argument fails. It is true that "the government may not use an involuntary confession against a defendant at trial." United States v. Hufstetler, 782 F.3d 19, 21 (1st Cir. 2015). To determine whether the government has proven that a confession "was properly elicited," id. at 22, courts "sift through the totality of the circumstances, including . . . the length and nature of any questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect," Hughes, 640 F.3d at 438. For similar reasons as those already described in finding that the interrogation was noncustodial and that Mikaiylov's consent to the cell phone search was voluntary, Mikaiylov's questioning was not coercive. See Swan, 842 F.3d at 33 (finding confession voluntary due to "previously discussed facts" showing lack of custody).

14

## **ORDER**

For the foregoing reasons, Mikaiylov's motion to suppress (Dkt. 177) is **DENIED**.


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge